IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RICHARD JAMES CHARCAS,

　　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　CIV 02-641 MV/KBM

CITY OF ALBUQUERQUE, and
BERNALILLO COUNTY,

　　　　　Defendant

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

　　　This matter is before the court on Defendant's *Martinez* Report and accompanying motion for summary judgment, as well as Plaintiff's motions to amend, for "relief," and to "set precedent." *See Docs. 20, 22, 23, 25, 26.*　　Plaintiff's assertions essentially boil down to three things: (1) he is an innocent man; (2) being tormented while incarcerated; and (3) almost everyone with whom he has had contact throughout his various arrests and incarceration is conspiring to harass him in some form or another.[1]　Having reviewed the *Martinez* Report in detail, I recommend that this action be dismissed.

### I.  Overview of Plaintiff's Arrests/Encounters With Law Enforcement

　　　Plaintiff apparently came to New Mexico from Texas sometime in early 2001.  *See e.g.,*

---

[1]  *See e.g., Doc. 1* at 2 ("on May 15, 2001 the Plaintiff was shot then falsely arrested and imprisoned by the Albuquerque Police Dept. [and] on March 19, 2002 . . . again falsely arrested and imprisoned. . . .   Since March 19th, 2002 arrest [he] has received excruciating harassment and torture starting with Jail guards and inmates who have been told to harass/provoke me with private information").

*Martinez Report,* Exh. B-26 ("I came from out of state"); *id.,* Exh. A-19 (5/12/01 incident; Plaintiff driving car with Texas license plates).  Over an approximately eleven-month period in 2001 and 2002, Plaintiff appears in six Albuquerque Police Department ("APD") incident reports and/or was incarcerated several times.  A review of the incidents reveals that Plaintiff exhibits volatile and aggressive behavior.

    ***May 12, 2001 Hit & Run:***  According to the statement Plaintiff gave the police, on May 12, 2001, he saw two men hanging around and looking at his car on two separate occasions.  He confronted them, saying to one of the men:  "'Hey fat man what's going on here?  Do they work for you?  Are they your snitches, you little pigs?'"  *Id.,* Exh A-21.  He confronted them a second time that day in order to "cuss them out" and intimidate them so they would "stay away from his apartments and his car."  *Id.*

    His second confrontation resulted in one of the two men shooting Plaintiff in the leg.[2] They began walking away as Plaintiff fled in his car.  Plaintiff then turned back and, driving recklessly (off the road, over the sidewalk, and into the landscaping of a fast food business in a congested area) successfully hit one of the men, Joseph Toledo, with his car.  Plaintiff then drove away from the scene to a hotel where the police later located him.  *See id.,* Exh. A18-21.

    Plaintiff was transported to the emergency room and, upon his release, was taken to the police station where he gave his statement after receiving and waiving his Miranda rights.  *See id;*

---

[2]  The shooter told police that four days earlier he had accidently bumped into Plaintiff on the street.  Although the shooter said "excuse me," he claimed Plaintiff gave him a dirty look and thereafter Plaintiff began cruising the area with his car where they had their initial encounter.  The shooter claimed that on May 12, 2001, he was just trying to scare Plaintiff, who had been verbally confrontational, had gone to his car, and upon returning demanded the others give him their gun.  The shooter claimed the discharge of the weapon was an accident.  *Id.* at A-25.

*see also id.,* Exh. A-29.  The prosecutor's office advised police that it "would most likely also prosecute [Plaintiff] because he struck Toledo with his vehicle after the incident was over and as Toledo was walking away."  *Id.,* Exh. A-22.  While waiting for the police to transport him to jail, Plaintiff became "extremely agitated."   After telling them they were taking too long, Charcas charged toward a police officer to put his foot in a door so it could not be shut.  Plaintiff then became "enraged . . . banging a chair against the door and [trying] to knock over a table in the room."  *Id.,* Exh. A-22.  Three officers handcuffed Plaintiff to a "'hitching post' until [he] calmed down."  *Id.,* Exh. A-23.

Charcas was taken to the Bernalillo County Detention Center and booked for aggravated battery with a deadly weapon.  *Id.,* Exh. A-23.  While incarcerated he received medical treatment for his gunshot wound.  He was released several days later, as early as May 16, 2001.  *See id.,* Exhs. B-35, B-97, B-112 - 122.

**June 26, 2001 Fight With Neighbors.**  The police were dispatched to the apartment complex where Plaintiff lived to deal with a fight in progress.  According to witnesses, Plaintiff provoked the fight with one neighbor outside in the parking lot.   *See id.,* Exhs. A-33, A-36 - A-40.  Plaintiff was treated for a cut to his hand, taken to the police station, questioned, and released.  *Id.,* Exh. A-33.

**July 14, 2001 Aggravated Assault & Criminal Damage To Property From Wal-Mart/Road Rage Incident.**  While standing in line at a Wal-Mart check out, Plaintiff turned to the couple behind him and said to the woman, "[H]ey red head is that the best you can do?"  *Id.,* Exh. A-44.  The woman's male companion subsequently argued with Plaintiff in the parking lot and attempted to mace Charcas.  Plaintiff then threw a rock at the man's truck, breaking two

3

windows.  Plaintiff left the scene in his vehicle, and the man followed in his truck.  At a stop light,

Plaintiff got out of his car and threw another rock at the truck, breaking the windshield.  *See id.,*

Exhs. A-44, A-46 - A-51, A-55.  The damage to the truck amounted to more than $3,000.  *See*

*id.,* Exh. A-55.

Plaintiff was arrested for aggravated assault and taken to Bernalillo County Detention

Center.  *See e.g, id.,* Exhs. A-44, B-98.  A few days later the state dismissed its complaint of

aggravated assault "without prejudice to the charges being refilled (sic) at a later date."  *Id.,* Exh.

B -107.  Plaintiff was released from jail.  *See id.,* Exh. B-99.

**September 4, 2001 Stalking Potential Employer.**  A woman notified police that Plaintiff

had been harassing her by coming in to fill out employment applications on three separate

occasions.  She further alleged that Charcas had followed her on her way home from work.

Because she reported that she feared for her safety, the officers gave her a restraining order

packet and advised her of options she could pursue.  *Id.,* Exh. A-65.

**September 15, 2001 Newspaper Incident.**  Police were called to Plaintiff's apartment

complex because of an altercation Charcas was having with a neighbor.  The neighbor complained

that Charcas had knocked on his door very early in the morning and offered him a paper, and he

believed Plaintiff was trying to see who was in the apartment with him.  The neighbor told

Plaintiff he had his own newspaper, instructed Charcas to refrain from knocking on his door so

early in the morning, and then closed the apartment door.  In response, Plaintiff became agitated,

grabbed a pipe and began shouting racial remarks.  *See id.,* Exhs. A-57, A-59.

The management of the apartment complex informed police that Plaintiff had also been "causing

problems with other tenants and [that management] had or will serve him with a seven day

notice." *Id.,* Exh. A-59.

**November 18, 2001 Trespass After Eviction.**  At least once after his eviction, Plaintiff returned to the apartment complex and was told by the management to leave.  The next time he returned, management put a notice of trespass sticker on his car, but Plaintiff scraped off the sticker and moved his car to another spot around the back of the apartment complex. Management therefore called the police, and Plaintiff was escorted off the property and given notice that further trespasses could result in arrest.  *Id.,* Exh. A-63.

**March 7, 2002 Second Aggravated Assault With Vehicle.**  On April 1, 2002, a grand jury charged Plaintiff with committing an aggravated assault on March 7, 2002 by "assault[ing] or strik[ing] at Kym Garcia, with a motor vehicle" in case CR-02001016.  *Id.,* Exh. B-139.  That same day, a bench warrant issued and Plaintiff was arrested on March 19, 2002.  *See id.,* Exhs. A-63, A-69, B-97.

**June 14, 2002 Indictment For July 2001 Wal-Mart Aggravated Assault Incident.**  On June 14, 2002, a grand jury also indicted Plaintiff for the July 2001 aggravated assault for which charges were previously dropped.  *See id.,* Exhs. B-142 - B-144.  It appears that Charcas has remained in the detention facility awaiting trial on both of the above indictments from March 19, 2002 to this day.

## II. Analysis

###   A.  <u>*Heck*</u> *Bars Plaintiff's Claims of "False Arrest" And "False Imprisonment"*

Plaintiff claims that he was subject to false arrests following the May 2001 hit and run incident, the July 2001 Wal-Mart incident, and the March 2002 aggravated assault incident.  *See Doc. 1,* at 3.  He seeks "immediate release," a "cease and desist order against NM barring any

further arrests without a federal warrant," "all pending charges and arrests dismissed with prejudice," and several million dollars in damages.  *Id.* at 6.

The damages relief he seeks is not cognizable in a § 1983 action, because "establishing the basis for the damages claim necessarily demonstrates the invalidity of the conviction."  *Heck v. Humphrey,* 512 U.S. 477,  483 (1994) ("*Heck*").  The *Heck* rule applies to suits such as this when filed by pretrial detainees.  *See Alvarez-Machain v. United States*, 107 F.3d 696, 700-01 (9th Cir. 1996); *Hamilton v. Lyons,* 74 F.3d 99, 102-03 (5th Cir. 1996).

The injunctive relief he seeks is likewise not cognizable in a § 1983 action.  Rather, such relief can be pursued in a habeas action following exhaustion of all state remedies.  Thus, because Plaintiff seeks "relief based on an allegation that his sentence was improper under state law, and that it therefore constitutes false imprisonment and a violation of due process under the Fourteenth Amendment," his claims of false imprisonment should be dismissed *without prejudice.*[3]  *See Moore v. Williams,* 23 Fed. Appx. 889, 892 (10th Cir. 2001)

### B.  *Plaintiff's Claims Of Harassment During Incarceration Should Be Dismissed*

### (1)  Applicable Standards

Under 28 U.S.C. § 1915A(b)(1), a court must dismiss prisoner complaint upon initial review if it is "frivolous . . . or fails to state a claim."  Furthermore, under § 1915(e) even though

---

[3] Even if Plaintiff's false imprisonment claim was actionable at this time, his own statements to the police in the May incident, the eyewitness statements in the July incident, and the grand jury indictment for the March incident supply the requisite authority to arrest.  *E.g., Romero v. Fay,* 45 F.3d 1472, 1480 (10th Cir. 1995) ("Once Defendants concluded that the initially discovered facts established probable cause, they were under no obligation to forego arresting Plaintiff or release him merely because he said he was innocent"); *Lehman v. Kornblau,* 134 F. Supp. 2d 281, 290 (E.D.N.Y. 2001) ("The existence of probable cause is a complete defense to a false arrest claim, even where the plaintiff was ultimately acquitted of the criminal  charges . . . .   Probable cause is also presumed when the a grand jury has handed down an indictment.").

a portion of the filing fee has been paid,[4] this Court nevertheless is required to "dismiss the case *at any time* if the court determines that " the action is "frivolous" or "fails to state a claim upon which relief can be granted." 28 U.S.C. §§ 1915(e)(B)(i)-(ii) (emphasis added). Similarly, a court can dismiss any complaint *sua sponte* without prejudice at any time under FED. R. CIV. P. 12(b)(1) for lack of subject matter jurisdiction where the federal claims are "so insubstantial, *implausible,* . . . foreclosed by prior decisions . . . , or otherwise completely devoid of merit as to not involve a federal controversy." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83 (1998) (emphasis added); *see also e.g., Apple v. Glenn,* 184 F.3d 477, 479 (6th Cir. 1999); *Harline v. Drug Enforcement Admin.,* 148 F.3d 1199, 1203 (10th Cir. 1998); *Olsen v. Aebersold,* ___ Fed. Appx. ___, 2003 WL 21580577 (10th Cir. 7/11/03).

The Seventh Circuit has noted that the *Steel* "substantiality" phraseology for such dismissals is not markedly distinct from the § 1915 "frivolity" standard. *See Ricketts v. Midwest Nat'l Bank,* 874 F.3d 1177, 1182 n.6 (7th Cir. 1989). In *Denton v. Hernandez,* for example, the Supreme Court explained that "a court may dismiss a claim as factually frivolous only if the facts alleged are 'clearly baseless,' . . . a category encompassing allegations that are 'fanciful,' . . . 'fantastic,' . . . and 'delusional,' . . . . As those words suggest, a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the *irrational or the wholly incredible.*" 504 U.S. 25, 32-33 (1992) (emphasis added).

I am aware that an *in forma pauperis* complaint may not be dismissed as frivolous merely because a court finds the "allegations *unlikely.*" *Id.* at 33 (emphasis added). Nor can the court

_____

[4]   A receipt attached to the left-hand side of the file shows the entire $150 filing fee was paid as of April 18, 2003.

resolve factual disputes concerning Plaintiff's allegations on a § 1915 analysis.  *Id., see also e.g., Lowe v. Sockey,* 36 Fed. Appx. 353, 357 (10th Cir. 2002).  However, the case before me does not present a situation where the complaint is dismissed *sua sponte* prior to amendment or answer by the defendants.  Here, Plaintiff has had the opportunity to amend his complaint and Defendants filed a comprehensive *Martinez* Report.

While I am also aware that a *Martinez* Report cannot be used to grant summary judgment when the verified complaint and *Martinez* Report contain conflicting facts, *e.g., Green v. Branson,* 108 F.3d 1296, 1302 (10th Cir.1997), conclusory and unsworn allegations are insufficient to create an issue of fact, *e.g., Barkus v. Kaiser,* 2000 WL 1346226 at * 2 (10th Cir. 2000) (and authority relied upon therein).  I would conclude it follows, then, that allegations which are "frivolous" within the meaning of § 1915 are likewise insufficient to create an issue of fact when considering a *Martinez* Report.

In any event, if the factual allegations are taken as true and construed liberally, if they fail to state a claim then the action is to be dismissed under § 1915(e)(2)(B)(ii).  *E.g., Elliot v. Cummings,* 49 Fed. Appx. 220, 226 (10th Cir. 2002); *Lowe,* 36 Fed. Appx. at 360-61.

### (2)  Plaintiff's Pleadings Are Frivolous

Large portions of Plaintiff's original complaint contain the very type of "fantastic or delusional scenarios with which federal district judges are all too familiar," *Neitzke v. Williams,* 490 U.S. 319 328 (1989), that qualify as "frivolous" under § 1915(e) or § 1915A.  To cite but a few examples, in his original complaint Plaintiff alleged that:  a psychology nurse called him "igger," "psychopath," and "dick swine" in front of other guards and inmates; an officer used "variations of [his] last name with 'sucks dick;'" another officer used his name "with vulgarity

AND tells the reprobate inmates to do the same," claiming not to "give a fuck" who Plaintiff sues; "all through the night" officers "harras[sed]" him with variations of his name such as "Sharco, Charco, Shakas, Shaka -- sucks dick, dick suck terrorist, long hair monster" and, when confronted, one officer stated that he (the officer) "hear[s] voices in the night telling [the officer] to say and do things." *Doc. 1* (attached page labeled "C. Cause of Action").  The bulk of Plaintiff's original complaint continues in the same vein.

Furthermore, Plaintiff's subsequent pleadings and allegations are rambling and have become increasingly more incoherent.  His assertions and demands appear both paranoid and outrageous when viewed as a whole.  Again, to illustrate but a few examples, in the supplemental allegations to Plaintiff's Complaint which I permitted him to file, *see Docs. 10, 14,* Plaintiff asserts that in addition to the verbal assaults by other inmates, they also throw urine and feces into his cell.  Plaintiff admits that he has thrown urine and feces under his door to "force the assailant . . . away." *Doc. 10* at 2; *see also id.* at 3-5.  Plaintiff maintains that the other inmates are being encouraged and rewarded by jail staff to engage in constant harassment of Plaintiff by "time cuts/food, and/or extra money" and "pills and coffee that keep them awake all night." *Id.* at 4.  As a result, Plaintiff claims he is kept awake whenever he sleeps and is sleep deprived.  *Id.*

Charcas further asserts that the other inmates talk on the telephone about him with their lawyers, psychological services unit, medical staff, administrative staff, probation and parole staff. Then, while they are on the telephone engaged in these conversations, the other inmates are repeating to Plaintiff the "slanderous" remarks made by the other person on the line.  *Id.*  He also contends that he was told there are cameras in his cell and therefore jail officials can see and film everything he does and writes.  *Id.* at 5.  He continues this theme in his "motion to set precedent,"

where he argues that inmates who are rewarded for their harassment of Plaintiff are "servants unto, and thus, employees of the Defendants; THAT the Defendants are definitely liable for and culpable for the actions of those BCDC inmate servants." *Doc. 25* at 2.

In his most recent motion to amend Plaintiff asserts that his "arrest" on the June 2002 indictment was made "fraudulently" and in retaliation for filing this lawsuit. *See Doc. 23* at 3 ("Count 10"). Charcas filed this action on June 3, 2002, and the grand jury indictment for the 2001 Wal-Mart incident was indeed filed thereafter on June 14, 2002. However, due to defects in Plaintiff's inmate account submissions and other deficiencies in his Complaint, summons did not issue in this suit until November 2001. *See Doc. 7* (and accompanying 11/7/02 docket entry re: summons). Thus, the timing of the second indictment does not suggest retaliation. Moreover, Plaintiff overlooks the fact that the Wal-Mart charges were previously dismissed without prejudice and could be brought at a later date. The charges were refiled shortly after allegations that Plaintiff had again assaulted someone with a vehicle in less than twelve months. Also in the most recent motion to amend, Plaintiff lists no less than 26 other "counts" of "crimes and violations by the Defendants," *Doc. 23* at 1, including allegations that:

!   he is being surveilled and monitored such that "Defense counsel has probably already read what the Plaintiff has written down days before he has been able to mail it," *id.* at 5 ("Count 13");

!   his court-appointed attorney has embezzled checks from him, *id.* at 6 ("Count 14");

!   *via* 24-hour surveillance, jail officials can watch him pray, which is contrary to the Bible and for which Plaintiff seeks a variety of injunctive relief including "THAT EVERY Sunday the Plaintiff receiveth a loaf of French bread from a local Smith's or Albertson's bakery or deli which costeth 99¢ or so, and that BCDC staff deliver that loaf of bread unto the Plaintiff and charge $4.00 dollars from the Plaintiff's account for a 300% profit to the Defendants," *id.* at 8 ("Count 19");

10

**!**    jail officials are tampering with his food, contaminating it so that Plaintiff will become sick, *id.* at 10-11 ("Counts 24-25").

Plaintiff's stated goal is undertaking the "daunting" task of "righting" all that is wrong with "Albuquerque's justice system." *Id.* at 13.

      A document entitled "sworn pleadings," which accompanies his most recent motion to amend, consists of twenty-six pages of daily entries, chronicling in detail alleged surveillance, slurs, contaminated food, flooding of his cell, etc. *See Doc. 24.* In his first entry, Plaintiff lists all of the "code names" others use for him. According to him, the names "are and are not limited to" *id.* at 1, the following:

> brasilero, brasilera, brasero, brasera, rio de janeiro, rio de daneiro, batumet, batumed, holloween, psycho, schizo, brazero, chernobl, charcoffee, char-cofski, charo-narco, garota, mi ruca, maricon, mariloco, sapo, saporillo, taladega, paladega, raider-iano, socks-dick, sucks-dick, dick-suck, dick-sucked, dick-sucker, omar, butt-fucked, maiates, gimp, pajaro, molestero, child molester, Iraqi, Iranian, Afgan, Afghan, Osama bin Laden, Sheik Omar, bedoin, nomad, fro-mad, lasiter, cadaver cell 5, cadaver, cadi-cell fife, five is fife, cadaver, Alabama, south alabaster, bessemer, informant, nigger, cocksucker, faggot, baggot, scarecrow, snitch, gay-chareaux, gay-charu, charles, charlie, char-lay, afro-arab, brazilian, brasilian, char-ass, shar-lay, sharu, shar-ass, shavez, ritchard-bithchard, puto, huto, hutu, hoera, hurra, zulu, target cell, the pick, hot-head, madhatter, placebo, study-cell, PC-bitch, study-hole, nappy-head, commi-charcos, communist, bolshivi-charcas, operator-ha'breed, convict, chavalla, chavala, chavana, castro-fidel, castro-charcos, new orleans-charles, charvez, new orleans-carlos, charbuckle, narcos-charcos, sharkos, caroshit, char-christ, spic-redneck, biggot, alberti-five, alberti-fife, biggot, bama, florida's fife, rio-cell-five, rio-cell-fife, ruca, heva, thorozine, sudafed, sue-the-fed, PSU ward, mental case, mental fife, mental ward-of-the-court, tagamet tagamed, unicor-fed, unicoe-fed, zolofski, zoloft-five, zolovski, alberti-prisoner, zendejas-fife, alberti-pinta-fife, eighty-nine, hatie-nine, hades-nine, Klebold-cell five, Klebolt cell fife, charles manson cell fife, conde-seebold fife, PC-huto, fed-informant, fed-rat, fed-bitch, fed-whlep, fed-nigger, fed-'igger, fed-puto, fet-hutu, target-puto, Mary Jones'-target, target huto, huto-jerk, puto-jerk, al-quida, terrorist, murderer, islamic-puto, islamic-huto, iran-fife, irqa-fife, desert-arab, desert-'igger, mixed-breed-fife, shi-ite-fife, fed-narc,

fed-sapo, marmona, mamon, she-mona, choncles, choctane, taliban, charcles, caracas, charros, charco, surcos, charcos, charov, charca, carlos, carca, char-dick, slow-cockos, iriqu-lutherian, thilomed, marcupio, marcupial, chatu-fife, fife is cell 3, cell 5 is in cell 3, cell fife in 3, african, afreaken-fife-Richard, bitch-Richard, Richard, houri-blowjobs, Jeffery Dahmler-cell 5, Jeffery Dahmler-cell fife, shawna's huto, shawna huto, orasco, ogre, baboso, perico, dick-head, molesto, heil-molester, mari-chafa, crybaby, test-rat, cocksucking-fed-rat, placedo-rat, placebo-rat, haycebo, marica, garugia, intubo-boto, butt-fuck-boto, dick-suck-Richard, iran-three, ha-breed, ha-war, ja-guar, hot-water-fife, condeschnist-jesus, stg-fife, hot-water five, fort-walton-beach, fort-walking-beach-s.t.g.-ruint, crestview, crestridge, afro-intubo, wrath-breed, suckos, chernobyl, barded-fife, dick-swine, long-beard-hutu, cirac, monster, assisted-suicider, sui-psycho, condeschnist-psycho, lobo-fife, cert-fife, lobo-huto, lob-charco.

*Id.* at 1-2 ("SP1"). The foregoing examples illustrate that Plaintiff's allegations are "irrational" and "wholly incredible." Therefore, I will recommend to the presiding judge that this action be dismissed under § 1915(e)(2)(b)(i).

### (3)   Alternatively, Plaintiff's "Answer" To The *Martinez* Report Is Insufficient To Create An Issue of Fact

The affidavits attached to the *Martinez* Report are in accord. The affiants state they did not verbally harass Plaintiff or hear any other officers verbally harass Plaintiff.[5]  Save for one affiant, none of them have heard another inmate verbally harass Plaintiff.[6]  The single affiant heard other inmates harass Plaintiff stated the verbal altercation occurred on December 19, 2002

---

[5]  *See Doc 22,* Exh. C, ¶¶14, 17 (Jonathon Thomas Affidavit); *id.,* Exh. D, ¶¶6-7 (Sergeant A.F. Bailey Affidavit); *id.,* Exh. E, ¶¶6-7 (Anthony Savorillo Affidavit); *id.,* Exh. F, ¶¶6-7 (Anthony Gonzalez Affidavit); *id.,* Exh. G, ¶¶6-7 (John J. Montoya Affidavit); *id.,* Exh. H, ¶¶6-7 (Michael Dwyer Affidavit); *id.,* Exh. I, ¶¶6-7 (Travais Oppenheim Affidavit); *id.,* Exh. J, ¶¶6-7 (Hans Eisenhert Affidavit); *id.,* Exh. K, ¶¶6-7 (Shawn McDonald Affidavit).

[6]  *See Doc 22,* Exh. D, ¶8 (Sergeant A.F. Bailey Affidavit); *id.,* Exh. E, ¶8 (Anthony Savorillo Affidavit); *id.,* Exh. F, ¶8 (Anthony Gonzalez Affidavit); *id.,* Exh. G, ¶8 (John J. Montoya Affidavit); *id.,* Exh. H, ¶8 (Michael Dwyer Affidavit); *id.,* Exh. I, ¶8 (Travais Oppenheim Affidavit); *id.,* Exh. J, ¶8 (Hans Eisenhert Affidavit); *id.,* Exh. K, ¶8 (Shawn McDonald Affidavit).

when Plaintiff was taking down the return addresses from the other inmates' mail from a sign off log.  The other inmates were "upset that Plf. was writing down information about their loved ones."  *See Doc. 22,* Exh. C, ¶16 (Jonathon Thomas Affidavit).

The affiants have never witnessed:  any inmate relieving himself in front of Plaintiff's cell or throwing such waste into Plaintiff's cell;[7] any inmate throwing coffee at Plaintiff;[8] or any type of physical confrontation with Plaintiff by either a corrections officer or another inmate.[9]  None of them recall any of the incidents recited by Plaintiff in his Complaint and supplemental allegations.[10]

Sergeant Bailey states that he never allowed a corrections officer to mace Plaintiff,, and Officer Gonzalez states that he never maced or punched Plaintiff.  *Id.,* Exh. D at ¶ 12, Exh. F. at ¶11; *see also Doc. 10* at 3.  Indeed, none of the documentation attached to the *Martinez* Report

---

[7]  *See Doc 22,* Exh. D, ¶9 (Sergeant A.F. Bailey Affidavit); *id.,* Exh. E, ¶9 (Anthony Savorillo Affidavit); *id.,* Exh. F, ¶9 (Anthony Gonzalez Affidavit); *id.,* Exh. G, ¶9 (John J. Montoya Affidavit); *id.,* Exh. H, ¶9 (Michael Dwyer Affidavit); *id.,* Exh. I, ¶9 (Travais Oppenheim Affidavit); *id.,* Exh. J, ¶9 (Hans Eisenhert Affidavit); *id.,* Exh. K, ¶9 (Shawn McDonald Affidavit).

[8]  *See Doc 22,* Exh. D, ¶10 (Sergeant A.F. Bailey Affidavit); *id.,* Exh. E, ¶10 (Anthony Savorillo Affidavit); *id.,* Exh. F, ¶10 (Anthony Gonzalez Affidavit); *id.,* Exh. G, ¶10 (John J. Montoya Affidavit); *id.,* Exh. H, ¶10 (Michael Dwyer Affidavit); *id.,* Exh. I, ¶10 (Travais Oppenheim Affidavit); *id.,* Exh. J, ¶10 (Hans Eisenhert Affidavit); *id.,* Exh. K, ¶10 (Shawn McDonald Affidavit).

[9]  *See Doc 22,* Exh. C, ¶18 (Jonathon Thomas Affidavit); *id.,* Exh. D, ¶11 (Sergeant A.F. Bailey Affidavit); *id.,* Exh. E, ¶11 (Anthony Savorillo Affidavit); *id.,* Exh. F, ¶12 (Anthony Gonzalez Affidavit); *id.,* Exh. G, ¶11 (John J. Montoya Affidavit); *id.,* Exh. H, ¶11 (Michael Dwyer Affidavit); *id.,* Exh. I, ¶11 (Travais Oppenheim Affidavit); *id.,* Exh. J, ¶11 (Hans Eisenhert Affidavit); *id.,* Exh. K, ¶11 (Shawn McDonald Affidavit).

[10]  *See Doc 22,* Exh. C, ¶19 (Jonathon Thomas Affidavit); *id.,* Exh. D, ¶13 (Sergeant A.F. Bailey Affidavit); *id.,* Exh. E, ¶12 (Anthony Savorillo Affidavit); *id.,* Exh. F, ¶13 (Anthony Gonzalez Affidavit); *id.,* Exh. G, ¶12 (John J. Montoya Affidavit); *id.,* Exh. H, ¶12 (Michael Dwyer Affidavit); *id.,* Exh. I, ¶12 (Travais Oppenheim Affidavit); *id.,* Exh. J, ¶12 (Hans Eisenhert Affidavit); *id.,* Exh. K, ¶12 (Shawn McDonald Affidavit).

shows that Plaintiff filed a grievance about the alleged June 22nd macing incident or that he visited the infirmary on that date.

Plaintiff claims that on May 19, 2002, Sergeant Thomas tripped, punched and dragged him to the infirmary while handcuffed. *See Doc. 1* (attached page entitled "C. Cause of Action"). Sergeant Thomas states that he has "searched Plaintiff's cell more than 100 times without ever having an incident such as the one that Plaintiff describes in his Complaint." *Doc. 22,* Exh. C at ¶ 9. Sergeant Thomas further states that he does not recall the May 19, 2002 incident and found nothing in his files to indicate he had a problem with Plaintiff that day. *Id.* at ¶ 8.

According to medical records, Sergeant Thomas did escort Plaintiff to the infirmary on that day for evaluation, and he states that it "is not uncommon for [him] to escort an inmate to that infirmary if the inmates requests to see a doctor or nurse." *Id.* at ¶¶10, 11. As Sergeant Thomas correctly notes, the medical reports "indicate that there were no lacerations on his wrists; no visible injuries; no swelling that he could touch each finger to his hands with his thumb; he could make a fist; and there was no swelling." *Id.,* Exh. C, ¶12; *see also id.,* Exh. B-40.

Although Charcas filed a grievance regarding the alleged May 19, 2002 incident, he refused to cooperate with the officer who was investigating his grievances. *See Doc. 22,* Exhs. B-19 & B-24. The investigating officer expressed concerned that Plaintiff is mentally impaired. *See id.* Indeed, every time Plaintiff has been referred to the psychological services unit, he has been uncommunicative and uncooperative, and accuses the staff of calling him names. *See id.,* Exhs B-3, B-4; B-55 - B57, B-50, B-59, B-60 - B-61. Following the alleged altercation with Sergeant Thomas, Plaintiff was taken to medical services to evaluate his wrists. Medical services reported to security that "handcuffs did not cause lacerations or swelling. Pulses are normal. ***He does not***

*c/o [complain of] other injuries.*  Stable – can return to level." *Id.,* Exh. B-40 (emphasis added).

Moreover, he refused sick call the next day.  *Id.,* Exh. B-39.

 The attached chart contains a chronology of events from the *Martinez* Report contents

and it shows that from the outset of incarceration, Plaintiff has continued his combative and

uncooperative behavior with jail staff and others.  His obstreperous behavior is chronic.  The chart

also establishes that despite Plaintiff's behavior, the detention facility staff respond to his

grievances and take appropriate measures with regard to their continued concerns about his

mental health and with regard to his physical health when Plaintiff engaged in a hunger strike.

 Plaintiff's response to the *Martinez* Report, while verbose, amounts to nothing more than

a conclusory assertion that the documents and affidavits are "false" and should be stricken.  *See*

*Doc. 27.*  As discussed in *Barkus v. Kaiser,* this is insufficient to create an issue of fact with the

*Martinez* Report.  *See* 2000 WL 1346226 at * 2 n.1 (10th Cir. 2000).  ("Mr. Barkus received an

opportunity to respond to the *Martinez* Report and his response consisted merely of assertions of

perjury and deceit by the state defendants, conclusory allegations he and others were subjected to

discipline by placement in the Phase Program, and identification of individuals he believes can

controvert the facts set forth in the report.  This is insufficient to show any conflict of facts.").

Therefore, even if Plaintiff's allegations are not "frivolous," he has failed to create issue of fact

following the *Martinez* Report.  Alternatively, then, summary judgment should issue in favor of

Defendants based upon their *Martinez* Report.

 Wherefore,

**IT IS HEREBY RECOMMENDED THAT:**

1.  Plaintiff's second motion to amend *(Doc. 23)* be GRANTED;

2.  Plaintiff's motion to set precedent *(Doc. 25)* be DENIED;

3.  Plaintiff's motion for relief *(Doc. 26)* be DENIED;

4.  This action be dismissed as frivolous under 28 U.S.C. § 1915(e)(2)(B)(i) or,

alternatively, this action be dismissed based on summary judgment in favor of Defendants

*(Doc. 20).*

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF**
>
> **SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file
>
> written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A**
>
> **party must file any objections with the Clerk of the District Court within the ten-day**
>
> **period  if that party wants to have appellate review of the proposed findings and**
>
> **recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE

# Charcas Chronology CIV 02-641 MV/KBM

| Date | Description | Martinez Report Page(s) |
|------|-------------|-------------------------|
| 5/12/01 | hit and run; Plf. jailed BCDC | A-8 - A-31 |
| 5/13/01 | Plf. is jailed in BCDC and being treated with Keflex for gunshot wound | B-53; B97; B-100 - B-101; B-102 |
| 5/14/01 | Plf. is jailed in BCDC and receives medical treatment for gunshot wound | B-35; B97 |
| 5/15/01 | Plf. is jailed in BCDC and receives medical treatment for gunshot wound | B-35; B97 |
| 5/16/01 | Plf. "NIC" or "not in custody" and doctor notes same on wound care chart | B-35; B97; see also B-112 - B-122 |
| 6/26/01 | fight with neighbors | A-33 - A-40 |
| 7/14/01 | Wal-Mart/road rage, aggravated assault; Plf. jailed BCDC | A-41 - A-55; B97 |
| 7/15/01 | jail medical history and screening form notes Plf. has been treated in the facility before; denies any mental problems; weighs 155 lbs | B-28; B97; B-98 - B-99 B-102 - B-103; B-104 - B-106; B-108 - B-111 |
| 7/17/01 | State dismisses complaint of aggravated assault "without prejudice to the charges being refilled (sic) at a later date" | B-107 |
| 9/4/01 | stalking potential employer | |
| 9/15/01 | newspaper incident | A-56 - A-61 |
| approx 10/18/01 | Plaintiff is evicted from his apartment complex | A-63 |
| 11/18/01 | trespass after eviction | A-62 - A-63 |
| 3/7/02 | date in the indictment that Plf. allegedly struck at Kym Garcia with a motor vehicle | B-139 |
| 3/19/02 | Plf. arrested on warrant for aggravated assault and admitted to BCDC; jail medical history and screening form notes he had been in the facility before. | see A-69; B-29; B-63; B97; B-123; B-123 - B-138 |
| 3/20/02 | took numerous attempts to remove Plf. from the medical facility in the jail, and he was refusing to speak at all; an EMT noted that he "has no apparent trauma" | B-29; B97 |

| Date | Description | Martinez Report Page(s) |
|------|-------------|-------------------------|
| 3/21/02 | Counseling Follow-up & Inmate Status log; Plf. does not want protective custody and refuses to sign the sheet; also refuses to sign receipt of inmate handbook stating he "did not see arrest warrant from APD" | B-62; B-65; B-67; B97 |
| 3/24/02 | Plf. taken to the "west side" of the facility and undergoes medical screen | B-30; B97 |
| 4/2/02 | grand jury files indictment against Plaintiff for aggravated assault No. CRCR 02001016 for assaulting Kym Garcia with his car; the police find him already in Bernalillo County Detention Center and re-book him into the facility on the warrant | A-67 - A-69; B- 123; B-139; B-139 |
| 4/6/02 | Plf. requests protective custody because he was "kicked out of all the other pods;" as "names of known enemies" Plf. states "names unknown, the (other inmates) said they had problems with me" | B-68 |
| 4/11/02 | Plf. cleared by medical to return to the general population | B-32 |
| 4/16/02 | According to Plf. in the morning inmates "from E-7 & E-2" awakened him "by calling my name and saying 'sucks dick.'  Inmate E-7 acts like he's on the phone but he's just taking to hands to provoke me.  I hand on the door and he says 'hey, our messing up [????].'  I demand that when inmates are let out they use the phone, showers, or work out NOT going from door to door visiting and cursing to provoke me.  If they want to visit put them in the same cell.  Officer . . . puts in the 'suck dick' program the others talk.  I demand this harassment be documented." | B-5 (resolved 1/28/03); B-6 (w/notation about memo) |
| 4/16/02 | Plaintiff is "furious!  I can't even make a phone call without that home in E-8 making noise.  He said it's part of this program that you gave him.  He called me racial slurs, 'jamaican nigger, long-haired creole nigger, half-breed punk nigger.'  If you guards are too week to discipline him, then allow me.  I demand that you bring him to me or allow me in his cell.  Let the devil feel Christian retribution.  Where's my lawyer?  I'm still on hunger strike!  The COs let E-8 out for as long as he wants, five times a day." | B-7 (resolved 1/28/03); B-8 (w/notation about memo) |
| 4/16/02 | According to Plf. when a "fat blond" woman from "psychology" comes to question him and he refuses; "after refusing her questions, she turns and calls me 'loser and psychopath' in front of two guards.  I refused her questions a second time and she calls me 'dick swine(?),' as she leaves.  Her supervisor comes and refused to give me her whole name . . . I refused the quack's questions.  I will not tolerate this harassment.  Starting April 16th I have refused to eat or shower, until I see my lawyer.  This same cursing harassment occurred at every pod on the westside by both inmates and staff." | B-3 (resolved 1/28/03); B-4 (w/notation about memo) |

| Date | Description | Martinez Report Page(s) |
|---|---|---|
| 4/16/03 | segregation order is entered transferring Plf. from "3 SW E-3" to administrative segregation until further notice; reason is because he "was involved in an altercation at the Westside facility; because Plf. "has a history of assaults" and is "violent", officers are advised to "use caution" | B-69 |
| 4/17/02 | Plf. Grievance re: inmates visiting and harassing him | B-5, B-6 |
| 4/17/02 | Plf Grievance re: racial slurs by E-8 | B-7, B-8 |
| 4/17/02 | Plf. Grievance re: psychologist questioning him | B-3 - B-4 |
| 4/17/02 | Plf. Grievance demanding "1 . . . two habeas corpus forms 2 the phone number and address at the Federal prosecutor's office and a Federal court judge 3 New Mexico State (Albuquerque) Circuit Court Judge's phone number and address 4 I demand a law library visit every week. J-pod westside officer says A. Flores (inmate) steal from me and he did not document it.  That officer is a traitor and a disgrace to the badge." | B-9 (resolved 1/28/03); B-10 (w/notation about memo) |
| 4/18/02 | Plaintiff was referred to psychiatric where a therapist attempted to evaluate him but Plaintiff was uncooperative.  The therapist noted that Plaintiff "refused to answer questions asked.  Accusing this writer of calling him names.  Sitting with back against wall making similar accusations about CO's and other residents.  Interview terminated when resident as interviewer to leave."  Because Plaintiff was "not open to PSU," he was cleared to return to the general population | B-55 - B57 |
| 4/19/02 | Plf. Grievance stating "Enough is Enough! Eve. shift Apr. 18th the dd ofc. Peyton comes in and instead count the [??] names; he harasses me using my name w/vulgar words & telling the reprobate inmates to do the same.  (Peyton also says, 'I don't give a fuck who he sues.').  I demand to be wired to prove my accusations.  Let me record your traitor, crooked, reprobate guards – they don't deserve a pension! If you don't wire me, a Federal court will and you will go down with them guards.  Morning Apr. 19, 2002, Lt. Eisenkart & Ofc. Soto comes to my door after I hanged on door because @ 7:45  known tatooed inmate harassing me @ my door.  The Lt allowed Soto to call me 'dick head' to my fact behind [?? ??].  I damn them and their families & I want the harassment stopped!" | B-11 (resolved 1/28/03); B-12 (w/notation about memo) |
| 4/19/02 | Plf. is moved from his present location to another area "3SW E3" because "inmate exhibits violent tendencies and [illegible]" | B-33 |
| 4/25/02 | review of Plf.'s classification in administrative segregation "3SE," caseworker recommends that he remain there | B-70 |

| Date | Description | Martinez Report Page(s) |
|------|-------------|-------------------------|
| 5/1/02 | Plf. Grievance stating "Throughout the whole night of April 30[th] - May 1st I was harassed constantly by Of. Savorello with Sgt. Thomas awareness and putting hin his two-cents-worth.  Of. Savorello would yell out "Sharco, Charco sucks dick . . . dick suck terrorist . . . long hair.  He would yell then let us sleep a half-hour then wake us up again and again.  In the morning I asked him if he ever found Charco.  He stupidly replied, 'Oh, is that your name?  I was just reading it from the board – I hear voices in the night telling me to do things.'  Yet he yelled no one else's name but what he thought was mine.  I demand an end to the harassment and sleep deprivation." | B-13 (resolved 1/28/03); B-14 (w/notation about memo) |
| 5/4/02 | Plf. Grievance stating "Dayshift Ofc. Operheim [?] & Ofc. McDonald harassing me with talk like "longhair dick suck . . . operator equipment G5.' That my cell number!  Evening shift Dwyer, Scott and even Sg. B[?] harssing me with 'longhair defendant – Charcas – Chariot – Charca.'  Your cocksucking coward officers are damned to hell!  Dayshift Plant[?] & Sanchez harassment; standing outside my door 'Aladega makes him pop, Charcos . . . dick suck convict'  Wed. May 8th Savorello says to inmate F. Martinez 'what did I tell you, Charcas was? – a jailhouse snitch!'  That's after he was harassing me through the night.  He said it was part of his job to harass me." | B-15 (resolved 1/28/03); B-16 (w/notation about memo) |
| 5/7/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 5/7/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-71 |
| 5/7/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 5/8/02 | Plf. Grievance stating "Wed. 7 a.m. Morning Shift Lt. Bell comes into my cell to harass me and provoke me.  He says I came from Westside for attacking a guard.  Then later he said I was in this cell because 'He's afraid of getting his ass kicked by the CO.'  He told Ofc. Sanchez & Travis then when Lt. Bell is taking my handcuffs off he pushes me forward as he puts the key in.  Then grabs the cuffs and scrapes moth my arms on the door.  I said why don't I just keep your cuffs so no one else has to go through this B.S.  I wiped the blood from my arms and banged on the door for medical." | B-17 (resolved 1/28/03); B-18 (w/notation about memo) |
| 5/8/02 | Plf. requests medical services to document and photograph a six-inch scrape on his right arm and four-inch contusion on his left arm saying "It was the result of harassment by Lt. Bell.  I wold also like some eye drops please." Not clear what was done on that day; on 5/15 - 16/02 the "plan" for this request was to refer it to security an other illegible entries | B-34 |
| 5/12/02 | Sgt. Eddie Hogan attempts to speak with Plf. and Plf. "did not wish to talk at all." | B-24 |

| Date | Description | Martinez Report Page(s) |
|---|---|---|
| 5/15/02 | Plf. refused to cooperate or answer questions and was taken to infirmary for evaluation of his wrists.  Neither wrist had lacerations and he could move and use his hands.  He did not complain of pain or "vice any problems" and was evaluated as stable to return | B-38 |
| 5/16/02 | Plf. Grievance stating "Thurs Morning, May 16th 2002, Ofcr. Savorillo and nurse walk around yelling 'Charcas sucks dick, Bhacka sucks dick, Saka sucks dick."  Even the nurse says the same.  They add 'Sherka sucks dick – there's nothing he can do about it.'  Fri. Morning Shift Ofc. Oppenheim & Ofc Allen continuously harass me:  "Charca, afro-long hair cut, dick suck – sucks dick, bankrupt convict, Charcas  [?] – welfare faggot,' etc.  Note:  Sgt. Davis contributed to the harassment.  At 5:00 a.m. May 19, 2002 St. Thomas tortures me by lifting me up by my handcuffs then kicking my R leg forcing me on the ground, putting my face on the ground then punching his finger into my face 5 times, trying to provoke me.  He then twists the handcuffs into my wrists all the way to medical and back.  Then he opens and closes my window cover laughing and calling me several times instead of patting me down her run my top down." | B-19 (resolved 1/28/03); B-20 (w/notation about memo) |
| 5/17/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 5/17/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-72 |
| 5/19/02 | Sunday:  Plf. refuses all meals | B-36 |
| 5/19/02 | note on form from medical to security that Plf. was brought to the infirmary for evaluation of his wrists due to handcuffs; states the "handcuffs did not cause lacerations or swelling" and that he did not complain of other injuries and was stable and could return | B-40 |
| 5/20/02 | Monday:  Plf. refuses breakfast and lunch but eats dinner | B-36 |
| 5/20/03 | Plf. refuses sick call | B-39 |
| 5/21/02 | Tuesday:  Plf. refuses breakfast, eats lunch, and refuses dinner | B-36 |
| 5/22/02 | Wednesday:  Plf. eats breakfast and lunch, but refuses dinner | B-36 |
| 5/23/02 | Thursday:  Plf. eats breakfast and lunch but refuses dinner | B-36 |
| 5/24/02 | Friday:  Plf. refuses all meals | B-36 |
| 5/25/02 | Saturday:  Plf. refuses all meals | B-36 |
| 5/26/02 | Sunday:  Plf. refuses all meals | B-36 |
| 5/26/02 | Sgt. Eddie Hogan attempts to speak with Plf. and Plf. "stated that he was tired and did not want to speak.." | B-24 |

| Date | Description | Martinez Report Page(s) |
|------|-------------|-------------------------|
| 5/26/03 | handwritten note from Plf. to Officer Dwyer protesting his innocence:<br><br>    If you read the book of ACTS of the APOSTLES in the new testament, you'll read where St. Paul was incarcerated for two years straight @ Cessaria even though he committed NO crime.  He then appealed to Rome.  On the way to Rome, St. Paul and some of the deckhands on the ship prayed and fasted for 14 days straight without food or drink.<br><br>    I know I can go longer; for I have committed not crime either.  St. Peter said:  For it is better, if the will of GOD be so, that ye suffer for well doing than for evil doing (1 Peter 3: [?]).  But he never lived in this evil justice system called America.  I add to the above scripture:  But beware; by far the worst kind of suffering is when you are so very innocent and you're treated as if you are damned and forcibly housed with the damned.<br><br>    This is the computer age.  Then why in hell does it take the cocksucking lawyers and judges so long to hear a case – to try a case?  Or a govt. case worker whose had 3 weeks and still I have no mail and no change of address forms.  I've been murderd by this arrest.  1 I lost my wife, 2 my automobile, 3 my apartment, 4 my job/internship 5 my property 6 my college career (5 courses, 5 str8 As @ UNM) everything.  For what?  I caused no bodily harm nor property damages – yet I lost everything! | B-21 |
| 5/26/02 | letter from Plf. to Dwyer apparently, saying "so now you understand my attitude.  Don't press me for conversation.  Don't ask me, "are you eating today?"  Just get me my goddamn tray!  Don't ask me, "how long has it been?"  You know today is day 8 w/out food or drink.  Don't lecture me about the lying cocksuckers on dayshift and what they said.  Leave me in peace! An if you want salvation, leave  [copy cut off] | B-22 |
| 5/25/02 | major disciplinary report; when officer takes Plf. his lunch, Plf. spits water into a gag and throws it at officer; when officer tried to close the food port, Plf. pushes it and refuses to move away from door as ordered; Plf. began yelling and cussing and banging on the door, telling the officer that he was "gay," that Plf was going to "fuck" him and would "kill" him | B-96 |
| 5/26/02 | Plf. refuses to sign the copy of the disciplinary report | B-96 |
| 5/27/02 | Monday:  Plf. refuses all meals | B-36 |
| ?? | undated letter from Plf. to Mariah Gurtz telling her he needs a call or appointment with his attorney, and complaint and change of address forms | B-23 |

| Date | Description | Martinez Report Page(s) |
|---|---|---|
| 5/27/03 | Sgt. Eddie Hogan memo referred to on grievances, recounting prior two attempts to speak to Plf. about his grievances and his lack of response, and further noting:<br>    On May 27, 2002 Inmate Charcas stated that he was not feeling well and he would speak to me another time.  Inmate Charcas' grievances range from inmates in the pod yelling at him to alleged harassment from staff both security and operations.  Although I am not qualified I feel that Inmate Charcas is mentally impaired.  The floor officers have informed my that Inmate Charcas has allegedly not eaten a meal in 8 days.  When I asked him why he is not eating he stated that he could go without eating fro 30 days.  I will continue to attempt to speak with Inmate whenever possible.  I also will ask PSU [psychology] staff to give me some sort of professional assessment of Inmate Charcas' psychological well being. | B-24 |
| 5/28/02 | Tuesday:  Plf. refuses all meals | B-36 |
| 5/29/02 | Wednesday:  Plf. refuses all meals | B-36 |
| 5/29/02 | letter from Plf. to Mariah Gurtz noting it is "day 11 w/out F&I" stating it has "been 3 weeks since I first asked for a change of address form.  it would greatly surprise me and indeed shock me if you were to bring me the following" listing complaints forms, books, and envelopes.  He also asked her to "check if my mail is being sent to my property (without knowledge)" | B-22 |
| 5/30/02 | Thursday:  Plf. refuses breakfast | B-36 |
| 5/30/02 | nurse notes on form from "MSU" to "PSU" that Plaintiff "has not eaten for 11 days" | B-40 |
| 5/30/02 | security takes Plf. to medical because of his hunger strike and denial that he is taking in fluids; weighs 130 lbs; Plf. refuses "lab draw" and medical care" and physical examination;"  he is assessed "AIT in nutritional intake" and security is to monitor his food intake | B-41 |
| 5/31/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-73 |
| 6/5/02 | Plaintiff "did eat today" | B-37 |
| 6/12/02 | Temporary Directive re: Plf.'s custody entered; Plf. to be housed in administrative segregation until further notice due to his "assaultive behavior towards other inmates;"  while there his cell door may not be opened unless two officers are present; any time he is out of his cell he is to be in full restraints; he is to be checked every 30 minutes | B-75 |

| Date | Description | Martinez Report Page(s) |
|------|-------------|------------------------|
| 6/13/02 | date grand jury indicts Plf. in CRCR - 02001785 for aggravated assault that occurred in July 2001 in Wal-Mart | B-142 - B-144 |
| 6/14/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 6/14/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-74 |
| 6/14/03 | the temporary directive is made permanent | B-76 |
| 6/17/02 | Plf. treated in medical for diarrhea, which he attributes to food poisoning | B-42; B-51; B-53 |
| 6/20/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 6/20/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-77 |
| ?? | undated medical note that Plf. was maced in the face by corrections officers and complained of irritated eyes; he was ambulatory and did not have other trauma or complaints and was not held in medical | B-45 |
| 6/28/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 6/28/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-78 |
| 7/11/02 | Plf. "brought to medical from J pod after an altercation.  Inmate denies receiving any blows to his head.  No visible injuries, no [?] dizziness, H/A or LOC.  PERL.  Inmate cleared to return to GP." | B-31 |
| 7/15/02 | Plf. Grievance stating he "never received any incident report as to why I'm in lock up.  I want outta reds into blues.  I want my file cleared – an inmate said I had PC status.  Why?  I want that taken off.  I signed that form on the West Side because I was kicked out/lied upon from all the other pods.  Why am I in this pod – in writing please?"  Response was "per directive assaultive behavior to other" | B-25 (resolved 7/17/02) |
| 7/15/02 | Plf. Grievance requesting the property manager to "send to me the checks I have in my property so I may mail them out OR put them on my account.  I came from out of state and no one can come to get them.  Also I need my shoes and hygiene products from my property."  Response was that the "checks in your property cannot be put on your books someone would have to pick them up cash them and then put the money back in your books."  Plaintiff indicated he wished to appeal and a subsequent notation notes "APPEAL, but not a grievance" | B-26 |
| 7/16/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 7/16/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-79 |

| Date | Description | Martinez Report Page(s) |
|------|-------------|-------------------------|
| 7/22/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-80 |
| 8/1/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 8/1/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-81 |
| 8/6/02 | Plf. submits slip to medical re: migraine headache but refuses sick call | B-43, B-46 |
| 8/8/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 8/8/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-82 |
| 8/13/02 | Counseling Follow-up & Inmate Status log; notes weekly review & plf. out of meds | B-62 |
| 8/13/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he be removed from administrative segregation but the committee denies removing him | B-83 |
| 8/23/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 8/23/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-87 |
| 8/24/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 9/3/02 | Plf. submits slip to medical re: headaches from lack of contacts but refuses sick call | B-44 |
| 9/3/02 | Plf. Grievance requesting a phone to arrange delivery of his glasses and a property review to obtain hygiene necessities. The telephone call was denied and the grievance was withdrawn on 9/24/03 because Plaintiff refused to sign it. | B-27 |
| 9/9/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 9/9/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-84 |
| 9/11/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 9/11/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-85 |
| 9/20/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 9/20/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-86 |
| 9/27/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |

| Date | Description | Martinez Report Page(s) |
|------|-------------|-------------------------|
| 10/2/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 10/2/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-90 |
| 10/9/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 10/9/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-88 |
| 10/16/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 10/16/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-89 |
| 10/23/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 10/30/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 10/30/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-91 |
| 11/6/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 11/6/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-92 |
| 11/15/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 11/15/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-93 |
| 11/20/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 11/20/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-94 |
| 12/5/02 | Counseling Follow-up & Inmate Status log; notes weekly review | B-62 |
| 12/5/02 | review of Plf.'s classification in administrative segregation "3SE" due to violent behavior; caseworker recommends that he remain there | B-95 |
| 12/23/02 | note from medical to "O.O.D." that there are not medical restrictions placed on Plf. | B-50 |
| 1/9/03 | Plf. submits slip to medical complaining of diarrhea; also requested eye exam and a pair of glasses | B-47 |

| Date | Description | Martinez Report Page(s) |
|---|---|---|
| 1/15/03 | Plf. submits slip to medical stating" MY EYES – MY EYES – MY EYES! Have mercy; I am blind without my glasses or contacts: 20/140 or so.  I am cordially and respectfully requesting/asking for a written estimate on eye exam and pair of glasses.  Thanks you kindly for your time and understanding and professionalism in this important matter."  He was advised "to have  a family member getting in glasses and notify medical." | B-48 |
| 2/7/03 | Plf. submits slip to medical stating: "I am a devout and humble Christian that is trying to endure this hateful and unwarranted incarceration:  for I am truly innocent! I therefore graciously request the blessing of milk @ every meal.  The grounds for my need:  I was arrested @ 165 lbs and now I weight 135 due to my great prayer and fasting and exercise regimine [sic] of eating food only on (usually) Wed. ant Sat.; that's right, I eat only two days a week and by the grace of GOD, I'm still healthy as a rock!  But plead for more milk and protein.  Thank you much."

Plf. was not seen by medical but medical assessed him as having an "alteration in mental status," and referred him to PSU for "potential for obsesive [sic] compulsive behavior; potential for religiousity [sic] behavior" | B-49, duplicated at B-58 |
| 2/13/02 | note on form from medical to PSU that Plf. was not eating and exercising exessively; upon evaluation, Plf. stated he only east two times a week and has lost 30 pounds and wants "no service but extra milk in place of meals;"  Plf. was assessed as "very aggressive, hostile, delusional. -- S/I" and was referred to a physician | B-50, B- 59, B-60, B-61 |
| 2/21/03 | the physician saw Plf. but Plf. "refuses to speak . . . Says he's angry because he's not been given the milk he was 'promised' by BSU.  Pt. was unwilling to listen and launched into a tirade about what UNM owes him."  The doctor assessed Plf. as "angry, refuses eval" | B-60, B-61 |